Jackie Wayne **GRIDER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 43728.

Court of Criminal Appeals of Texas.

June 23, 1971.

---

1. The indeterminate sentence law does not apply under Art. 63, V.A.P.C.

**394**

James E. Bock, Waco (Court appointed), Don Hall, Waco (Court appointed), Neal Wheeler, Dallas (Court appointed), William Frank, Houston (Court appointed), for appellant.

Henry Wade, Dist. Atty., John B. Tolle, Harry J. Schulz, Jr., W. T. Westmoreland, Jr., and Edgar Mason, Asst. Dist. Attys., Dallas, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal arises out of a conviction for murder where the punishment was assessed at death.

The trial occurred in Dallas County after a change of venue from McLennan County.

The sufficiency of the evidence is not challenged, but we are met at the outset with the most serious question in the case. The appellant contends that his constitutional rights were violated by the trial court's improper exclusion of prospective jurors who had expressed conscientious or religious scruples against the infliction of the death penalty. Reliance is had upon Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

In Witherspoon the United States Supreme Court said:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

"Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution. The State of Illinois has stacked the deck against the petitioner. To execute this death sentence would deprive him of his life without due process of law."

As to the matter of voir dire examination the Court in footnote #9 of the Witherspoon opinion said in part:

"[I]t cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' (see People v. Bandhauer, 66 Cal.2d 524, 531, 58 Cal.Rptr. 332, 337, 426 P.2d 900, 905) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him.
* * *

"The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood—or misunderstood—by prospective jurors. Any 'layman * * * [might] say he has scruples if he is somewhat unhappy about death sentences. * * * [Thus] a general question as to the presence of * * * reservations [or scruples] is far from the inquiry which separates those who would never vote for the ultimate penalty from those who would reserve it for the direst cases.' Id., at 308–309. *Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.*" (emphasis supplied)

In Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433, the Supreme Court further said:

"[I]t is entirely possible that a person who has 'a fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law—to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case."

The case at bar was tried[1] prior to the date of the Witherspoon opinion and without the benefit of that decision. Nevertheless, the Witherspoon decision must be applied retroactively. See footnote #22 of the Witherspoon opinion, supra; Pittman v. State, Tex.Cr.App., 434 S.W.2d 352; Ex parte Bryan, Tex.Cr.App., 434 S.W.2d 123; Harris v. State, Tex.Cr.App., 457 S.W.2d 903; State v. Ruth, 276 N.C. 36, 170 S.E.2d 897.

It appears without dispute that of the 72 prospective jurors examined 23 were excused because of their opposition to the extreme penalty. Although the entire voir dire examination is not in the appellate record, we conclude that the portion brought forward, when considered in light of the remainder of the record, is sufficient to dispose of appellant's contention.

The record reflects the interrogation of prospective juror Josie Boyd as follows:

"Q. * * * I tell you that now so that I can ask you if you have any conscientious or religious scruples that would keep you yourself from voting the death penalty in a proper case; in other words, I'm asking you how you feel about the death penalty?

"A. Well, uh—

"Q. You just don't believe in the death penalty?

"MR. BOCK: Your Honor, we're going to object to his suggesting that.

"THE COURT: Do you understand the question?

"THE PROSPECTIVE JUROR: Yes, sir.

"THE COURT: Well, answer it.

"A. Well, I'll put it this way: I don't believe in it in a way, and in a way I do believe in it.

"Q. Well, let me explain it to you this way: The law entitles the State to have twelve jurors who, in a proper case where the law permits it and the facts warrant it, who could and would willingly vote the death penalty just like the Defense is entitled to twelve jurors who could and would consider the minimum punishment if the facts warrant that. I will be satisfied with whatever answer you give me, but if you have some reservation that would keep you yourself as a member of the jury from voting the death penalty, then I would appreciate your telling me just what your feelings are about it.

"A. Well, uh, I am a strong believer in Christ and the Bible says thou shalt not kill. I just don't believe in it.

"Q. You just really don't believe in it?

"A. I really don't.

"Q. Then I take it that your feeling would influence your verdict if you were taken on this case?

"A. I believe so.

---

1. The evidence reflects the offense occurred on December 8, 1967. The indictment was returned on December 28, 1967. Change of venue was ordered on February 26, 1968. The trial commenced in Dallas County on May 20, 1968.

The transcription of the court reporter's notes was not filed until August 5, 1970. The record was not received by this Court until November 20, 1970. As a result of this Court's caseload, this case was not submitted until June 2, 1971.

"Q. I expect we ought not to take you, feeling as you do. Maybe you can get on some other case—

"THE COURT: Take your card and go back to the Central Jury Room."

William D. Crockett was also shown to be a prospective juror and his interrogation reflects the following:

"Q. This is a murder case and the possible penalty for murder in Texas is the electric chair. The State will be asking the death penalty in this case and I tell you that now so that I can ask you if you have any conscientious or religious scruples or reservations of mind that would keep you yourself from voting the death penalty in a proper case. In other words, I'm asking you if you believe in the death penalty and if you could give it where the law permits it and the facts justify it?

"A. No, sir.

"Q. You just don't believe in the death penalty; I take it that your feeling would influence your verdict, then.

"A. Yes.

"Q. I expect we ought not to ask you to serve.

"THE COURT: Get your card and go back to the Central Jury Room. Go back downstairs where you have been."

The following occurred during voir dire interrogation of Thomas E. Mills:

"Q. Good. Now, the penalty for murder ranges from a minimum of two years in the penitentiary and up to and including life imprisonment and, in extreme cases, death in the electric chair. Now, the State will be asking the death penalty in this case, urging and contending that it is the only proper punishment for the crime committed—

"A. I don't believe in capital punishment.

"Q. You think your feelings would interfere with your verdict?

"A. Yes, sir, I believe they would.

"Q. You think they would?

"A. Yes, sir, I do.

"Q. I believe we should excuse you, Mr. Mills, and you can serve on a less serious case.

"THE PROSPECTIVE JUROR: Thank you.

"THE COURT: Get your card, please, sir, and go back to the Central Jury Room."

Mr. R. C. Turman was interrogated as follows:

"Q. This is a case that is alleged to have occurred in McLennan County down in Waco and I believe that the evidence will show that the victim in this case was a Baylor University student, a young girl. I mention that to you so that I may ask you if you hold any opinion as to the guilt or innocence of this Defendant?

"A. Well, if we are seeking death, I would.

"Q. You just don't go for the—for death at all?

"A. I think it's a good law if someone doesn't have these scruples about it.

"MR. ALEXANDER: I expect we'd better not ask you to serve. We submit the Juror, Your Honor.

"THE COURT: Get your card, please, and return to the Central Jury Room."

Mrs. Bennie Gipson was interrogated as follows:

"Q. How do you feel about death as a punishment for crime, do you believe in the death penalty?

"MR. BOCK: I object, Your Honor—

"THE COURT: I sustain that.

"Q. The State will be asking the death penalty as one of the possible penalties for murder and I tell you that now so that I may ask you if you have any religious or conscientious scruples that would keep you yourself from voting the death penalty in a proper case— what I'm asking you is if you would vote the death penalty in a proper case?

"A. I don't think so.

"Q. Would your feeling influence your vote if you were on the jury?

"A. I just don't think I would vote the death penalty.

"Q. Then it would influence it to that extent?

"A. Yes.

"MR. ALEXANDER: We submit the Juror, Your Honor.

"THE COURT: Get your card over here."

Jesse T. Mize, Sr., was interrogated as follows:

"Q. As you were told, you have been called as a prospective juror in a murder case. The punishment for murder ranges from a minimum of two years in the penitentiary up to and including life imprisonment and, in extreme cases, death in the electric chair. The State will be asking the death penalty in this case, urging and contending that it is the only proper punishment for the crime committed. I tell you that now so that I may ask you the question: If you have any conscientious or religious scruples that would keep you yourself from voting the death penalty in a proper case?

"A. Yes, sir, I have a deep feeling about that. It has never been brought down to that before, but I have a deep feeling about the death penalty.

"Q. Then I take it that your feeling would influence your vote if you were taken as a juror on the case?

"A. Honestly, I believe it would.

"MR. ALEXANDER: We submit the Juror, Your Honor.

"THE COURT: Get your card and report back to the Central Jury Room."

After the examination of an additional prospective juror, defense counsel objected to any further juror disqualification "on the grounds of conscientious or religious scruples and reminded the court of his motion in limine [2] and requested the court to allow his objection "to go back" to each prospective juror who had been excused for cause because of his conscientious scruples or objection to the death penalty. The court responded: "Yes, on that point only for cause. Mr. Reporter, I believe that's all. Does either side have any more for the Reporter to take down?"

Thereafter the reporter was excused by agreement "except when called out on special occasions." [3]

Subsequently, we find that during the voir dire interrogation of prospective juror

---

2. Prior to trial the appellant's counsel filed a motion in limine which, among other things, requested the trial court "[t]o instruct counsel for the State not to challenge for cause because of any expressed conscientious scruples against the imposition of the death penalty." The motion was overruled.

3. Appellant's counsel acknowledges as hindsight that he should not have agreed to excuse the court reporter from taking all of the voir dire examination, leaving him on call, in a case where the State was seeking the death penalty. The difficulty in attempting to reconstruct the voir dire which occurred in the court reporter's absence is always apparent from the court reporter's notes taken after he is recalled. And in the case at bar most of the hearing on the motion for new trial was devoted to attempting to reconstruct that portion of the voir dire examination not recorded.

Floyd Rhodes the court reporter was re-called and the record reflects the following:

"MR. ALLEN: The prospective juror has stated that he has conscientious or religious scruples against the infliction of the death penalty and has the feeling that it would influence his verdict, whereupon the State submitted this Juror for cause which was granted and the Defense wants to ask a question.

"MR. BOCK: Mr. Rhodes, my name is Bock and I'm one of the Defense lawyers in this case and I would like to ask you that if your feeling and opposition to the death penalty would in any way affect your verdict as a juror on the subject of guilt or innocence alone, understanding, of course, that in our State the jury must, first of all, decide whether a person is guilty or innocent before any question of punishment comes into play. Now, would your feeling on the death penalty in any way interfere with your decision as to whether a person was guilty or innocent, disregarding punishment, because it doesn't play any part in a deliberation on the question of guilt or innocence? In other words, those are two separate hearings. Would your opinion as to death or punishment interfere with your separate consideration of the guilt or innocence of the Defendant?

"THE PROSPECTIVE JUROR: No.

"MR. BOCK: Your Honor, we submit that he is qualified to serve on this jury.

"THE COURT: Any further question?

"MR. BOCK: No, Your Honor.

"THE COURT: Overruled.

"MR. BOCK: Note your exception.

"THE COURT: Get your card and return to the Central Jury Room. That's all, Mr. Reporter."

■ On the hearing on the motion for new trial the appellant sought to establish by witnesses who were present during portions of the voir dire examination that the foregoing examples were typical of the interrogation of all jurors regarding qualification on the death penalty. The State did not offer evidence to controvert such testimony. It would certainly seem that the "atmosphere of the proceedings" must be considered in resolving the question of whether the jurors were properly selected within the Witherspoon rationale.[4] Jaggers v. Commonwealth, 439 S.W.2d 580 (Ky.); Illinois v. Speck, 41 Ill.2d 177, 242 N.E.2d 208; Harris v. State, supra, footnote #3. It is also observed that in most instances the prosecutor never made a formal challenge for cause. It was usually "We submit the juror" or "We expect you ought not be asked to serve," etc. Without more, the trial judge told the prospective juror "to take his card and go to the Central Jury Room." Whether this is the customary practice in Dallas County is not revealed by this record.

■ It thus appears that the voir dire examination in the case at bar is in many respects substantially similar to the examples of voir dire interrogation set forth in

4. In this connection we note that Mrs. Pat Maloney, wife of defense attorney Bob Maloney but who had worked in the District Attorney's office, was also a prospective juror. Although the appellant apparently did not desire this juror, the record reflects the following:
"THE COURT: Do both sides want her to serve on another case?
"MR. BOCK: Yes, Your Honor.
"MR. ALEXANDER: We'll accept her right now, Your Honor.
"MR. BOCK: Your Honor, we can't accept her.
"THE COURT: Do you believe in the death penalty?
"THE PROSPECTIVE JUROR: I never thought about it before.
"THE COURT: We could spend an hour and a half on this; I'll excuse you. Any objections.
"MR. BOCK: No, Your Honor."

Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433, and Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221, which the United States Supreme Court clearly indicated did not meet the Witherspoon standards. See footnote #9 of the Witherspoon opinion, supra.

In Pittman v. State, 434 S.W.2d 352, 356, this Court said:

"It has long been the traditional practice in Texas, before and after the effective date of the 1965 Code, not to excuse a juror in capital cases who simply stated he had conscientious scruples against the death penalty but to interrogate such juror further to determine if this means that he or she could never vote for the death penalty. The challenge for cause on this ground has always been understood to mean that because of such scruples the juror could never vote to inflict the death penalty in any case regardless of the facts or circumstances. Until this appeared the challenge for cause was not sustainable. Such practice squares with the requirements of Witherspoon."

It is clear then that the procedure utilized in the case at bar in excusing prospective jurors after an initial expression of "conscientious scruples" or disclaimer of belief in capital punishment without going further and ascertaining that the prospective juror would automatically vote against the death penalty in any case regardless of the facts or consider its imposition in the case irrespective of the evidence, etc., does not square with Witherspoon or the traditional Texas practice.

This Court has been called upon before to reverse convictions where, in violation of Witherspoon, a substantial number of the jury panel has been "excluded without any effort to find out whether their scruples would invariably compel them to vote against capital punishment."[5] See Ex parte Bryan, Tex.Cr.App., 434 S.W.2d 123; Ellison v. State, Tex.Cr.App., 432 S.W.2d

955. Cf. Spencer v. Beto, 5 Cir., 398 F.2d 500.

There is, of course, another matter we must consider in light of the interrogation of the various jurors. Mr. Justice Stewart, who wrote the majority opinion in Witherspoon, said:

"The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt." See also Williams v. Dutton, 5 Cir., 400 F.2d 797, 805.

■ Thus Witherspoon does not preclude a challenge for cause by the States when it is established that a prospective juror's reservations concerning the extreme penalty would affect his impartial determination as to the guilt of the accused. Harris v. State, Tex.Cr.App., 457 S.W.2d 903, 912. Cf. Ladetto v. Commonwealth of Massachusetts, Mass., 254 N.E.2d 415; Tilford v. Page (W.D.Okl.), 307 F. Supp. 781, 786, 787; Williams v. Wainwright (S.D.Fla.), 308 F.Supp. 81.

The prosecutor's questions as to the jurors' "feelings," however, did not clarify whether he had reference solely to an impartial decision as to the guilt of the appellant so as to establish the disqualification of the jurors. And as reflected by the interrogation of the prospective juror Rhodes, this "feeling" did not prevent him from being a fair and impartial juror on the issue of guilt alone. Cf. interrogation of prospective juror Mrs. Gipson, supra.

Under these circumstances, it is clear that we are called upon to reverse this conviction. Although the appellant has been indicted for committing murder and the evidence reflects a most horrible—a brutal—crime, he cannot be executed for that crime

5. Witherspoon at 88 S.Ct. 1773.

**400**

until a jury selected in accordance with his constitutional rights has convicted him.

We need not, therefore, reach the question of whether the decision of the Fifth Circuit Court of Appeals in Marion v. Beto, 434 F.2d 29, cert. den. 402 U.S. 906, 91 S.Ct. 1372, 28 L.Ed.2d 646, compels the same result. In Marion, the Court held that even though the proper Witherspoon standard is recognized and utilized, the improper discharge of even one prospective juror without a determination of whether his scruples would invariably compel him to vote against the death penalty would be federal constitutional error in violation of the 6th and 14th Amendments calling for reversal. This decision reached "after some hesitation" is in sharp conflict with the decisions of this Court. See, i. e., Pittman v. State, supra; Scott v. State, Tex. Cr.App., 434 S.W.2d 678; Branch v. State, Tex.Cr.App., 447 S.W.2d 932; Whan v. State, Tex.Cr.App., 438 S.W.2d 918; Harris v. State, supra; Morales v. State, Tex.Cr.App., 458 S.W.2d 56; Huffman v. State, Tex.Cr.App., 450 S.W.2d 858; McKenzie v. State, Tex.Cr.App., 450 S.W.2d 341; Thames v. State, Tex.Cr.App., 453 S.W.2d 495. See also Bell v. Patterson, 10 Cir., 402 F.2d 394; State v. Mathis, 52 N.J. 238, 245 A.2d 20, 27. Prior to the Marion decision this Court readily recognized the split of authority in this country regarding this question and came down sharply on the other side of the ledger. See Harris v. State, supra, footnote #4; Morales v. State, supra. Whether the Marion decision is binding on this Court need not be determined in this cause. See Pruett v. State, Tex.Cr.App., 463 S.W.2d 191, 194.

The reversible error presented by this cause relates to penalty only. The State has sought the death penalty which only a jury may impose. For the reasons stated in Ellison v. State, supra, "[t]his court is without authority to direct a new trial before a different jury *on the issue of pun-*

*ishment only.*" (emphasis supplied) Cf. State v. Ruth (N.C.), supra.

For the reasons stated, the judgment is reversed and the cause remanded.

ROBERTS, J., not participating.